### *In re* Ross' Will.

### White *et al. v.* Ross.

#### (*Supreme Court, General Term, First Department.* October 20, 1892.)

1. Wills—Undue Influence—Husband and Wife.
   Testatrix's will made in favor of her husband was prepared in contemplation of marriage, and executed immediately after it. In the contest of the will by the brothers and sisters of testatrix it appeared that testatrix was somewhat childish in her ways and tastes, and of rather undeveloped mind; that she had been practically abandoned by her relatives, and was living in seclusion in a boarding house at the time she married proponent, who had provided for her a home; that he had entertained the idea of marrying her before he knew she had any property, but had not done so for fear he could not support her; that he had made his own will in her favor, and it was shown that the attorney who prepared testatrix's will did so under her instructions, the husband having nothing to do with it. *Held,* that there was no evidence that fraud, coercion, or undue influence was brought to bear on testatrix in the disposal of her property.

**2. SAME—LETTERS WRITTEN AFTER MARRIAGE.**

　　Letters written after marriage by testatrix to her husband were properly admitted in evidence as showing there had been no change in testatrix's condition of mind, and that she exhibited the same characteristics in her peculiar forms of expression and references to persons after as before marriage.

　　Appeal from surrogate's court, New York county.

　　Proceeding by Alexander Ross for the probate of the will of his wife, Annie Cora Ross, deceased. From a decree admitting the will to probate, contestants, the brothers and sisters of testatrix, appeal. Affirmed.

　　Argued before VAN BRUNT, P. J., and O'BRIEN and PATTERSON, JJ.

　　*Daly, Hoyt & Mason,* (*Chas. P. Daly,* of counsel,) for appellants. *Thomas Nelson,* for respondent.

　　PATTERSON, J. This appeal is from a decree of the surrogate of the county of New York, made November 4, 1891, admitting to probate the last will and testament of Annie Cora Ross. The will was executed on the 20th day of March, 1889, and by it the testatrix devised and bequeathed all her real and personal property to her husband, Alexander Ross. The brothers and sisters of the testatrix, viz., James B. White, Alexander White, Jr., Elsie White, and Mary S. White, filed objections to probate, and set up as the grounds of contest that the alleged will was not the free, unrestrained, and voluntary act of Mrs. Ross; that she was not of sound mind, memory, or understanding, or capable of making a will, when the paper offered for probate was executed; that it was not subscribed, published, or attested as required by law; that execution of the instrument was procured by fraud, circumvention, and undue influence practiced upon the decedent by Alexander Ross, the executor, sole legatee, and beneficiary under said will, or some other person unknown to contestants. After hearing the proofs the surrogate found against the contestants on all the grounds of opposition urged by them, and the decree establishes that the will was the free and voluntary act of the testatrix; that she was at the time of its execution of sound mind and memory, and competent to make it, and fully comprehended its provisions, and that it was not obtained through restraint, coercion, fraud, or undue influence by the said Alexander Ross, her husband, or any other person whomsoever. The objection to the execution of the will, as not being in due form and as prescribed by statute, is not insisted upon, and the evidence utterly fails to establish a want of testamentary capacity in the testatrix. There is but one standard of such capacity known to the law of this state, and that is embraced in the inquiry, was the decedent *compos mentis* or *non compos mentis,* as those terms are settled in the law, at the time of the execution of the instrument? *Parish Will Case,* 25 N. Y. 9. It was not proven that Mrs. Ross was incapable of making a will had she been left to the uncontrolled exercise of her own judgment and volition. She had previously and at various times conveyed interests in her father's estate to members of her family and others, and the testimony fails to disclose any change in her mental condition intermediate the first of those conveyances and the execution of the will. The real contest made before the surrogate was on the question of undue influence and coercion in the procurement of the execution of the will. There is no serious controversy respecting the rule of law controlling in cases of this character, but we are required to analyze the evidence and review it carefully to ascertain whether fraud, coercion, or undue influence was resorted to by the proponent or others to induce the testatrix to dispose of her property in favor of her husband, to the exclusion of her brothers and sisters.

　　The proposition of the appellants, stated substantially in their own words, is that the weight of evidence establishes or raises a presumption, so strong that only the most positive proof will rebut it, that the execution of the will was procured as the result of a carefully planned, prearranged conspiracy on

the part of Ross and his confederates, acting on a person whose body and mind, originally weak and feeble, had been further debilitated by long-continued ill health and serious sickness. Of this alleged conspiracy we find no evidence whatever. It is a mere gratuitous assumption, and could only be sustained by arbitrarily putting an evil construction upon acts of parties; ascribing to them motives not justified by testimony; distorting that which they did and said; and weaving an imaginary fabric of fraud out of circumstances altogether consistent with honest and upright conduct. It must be borne in mind that this will was made in favor of a husband, was prepared in contemplation of marriage, and executed immediately after the marriage ceremony was performed; that the testatrix lived with her husband for two years after the marriage in apparent contentment and happiness, and died then of an acute disease. Looking at the testimony to ascertain the physical and mental condition of the testatrix at the time of her marriage and the execution of the will, we find the accounts given by the testator's witnesses to be either exaggerated or of trivial circumstances. It is claimed that she was feeble minded; that she was eccentric and whimsical. Boarding house keepers, dressmakers, and servants have testified to her childish ways and tastes. She dressed in a manner unsuitable to her age; she was fond of playing with little children; she kept herself isolated in her darkened room, and stayed there week after week; she was not given to reading; she would not associate with other boarders in the houses in which she lived, but took her meals in her room, and often, and, as is claimed, unreasonably, objected to the food prepared for her. But all these circumstances do not show any especial weakness of mind, when they are considered in connection with other facts. The testatrix lived secluded. It was her fancy. Her knowledge of the world and society was limited. She had force of character enough to know what she wanted, and to have her own way, and to get what she required. Her seclusion and repugnance to general society are fully explained. She suffered from facial paralysis, and took nothing but liquid food for a long time, and it was but natural that she should dread being a spectacle for the gossip or entertainment of a boarding-house table. But she was undoubtedly unfamiliar with general society and her mind was not developed; there was no such feebleness, however, as would indicate a lack of judgment in those matters which affected her property or her condition. The learned surrogate evidently was impressed with what is one of the most striking considerations in the whole case, and that is, why did the mother and brothers and sisters of this testatrix allow her to live alone, in rooms at a boarding house, in a strange city, where she might become the easy prey of an adventurer if she were mentally incapable of taking care of herself? Not only did they allow that, but it appears that her mother or sister refused to permit her to know their address in Chicago, and, at the time she became engaged to Ross, she was virtually abandoned by those of her relatives who should have been prompt to protect her. But, further than this, the attorney who prepared the will did so on the instructions of the testatrix herself, and Ross had nothing to do with them. The attack upon this attorney and on the proponent's witnesses is not justified by the evidence as we find it in the record. The dishonorable and fraudulent conduct imputed to them is not proven. They are not shown to have aided Ross in an attempt to impose upon and overreach the testatrix. The worst that can be said of Ross is that he made a mercenary marriage, but even that is not at all clear. He was no stranger to the testatrix nor to her family. He had known them for several years. He had entertained the idea of marrying the testatrix for some time, but his means were limited, and it was not until he learned from Reynolds that the testatrix had interests in her father's estate (of which and the extent of which she also was in ignorance, as would appear) that he proposed marriage. Here again the attack on this witness (Reynolds) is unfounded. We can find nothing impeaching his tes-

timony in the printed record, and had his appearance on the stand been unfavorable the learned surrogate would not have failed to observe it.   Throughout the whole testimony, in considering the relation of Ross to the testatrix, the manner of her life, the loneliness of her situation, the conduct towards her of her relatives, their acts respecting her share of her father's estate, the fact that Ross in marrying her furnished her with a home, and the affection and protection of a husband, that he made his own will in favor of his wife, that she fully understood and comprehended what she was doing, we can see no reason for setting aside the decree of the surrogate.   In reaching this conclusion we have not overlooked any of the testimony.   That of Mr. Wellman is relied upon by the contestants as showing that the proponent knew that the testatrix was of feeble mind.   Giving that testimony full weight, it appears that Ross consulted Wellman as to what he should do respecting a proposed marriage.   He told Wellman that the lady was single, of not very sound mind, easily influenced, that she had no protector, and her relatives were endeavoring to obtain her property; and Wellman advised him "that, if he could afford her better protection by becoming her husband, I thought he had better do so."   On that advice Ross acted.   What he stated to Wellman as being the situation of Miss White was true.   Her relatives had left her unprotected, it certainly appears that they were trying to get her property, and it may be that she was not of very sound mind, and needed protection.   She made her contract of marriage and her will to secure protection, and she received it.   Not one word is contained in the evidence to show that Ross was other than a faithful and devoted husband, and her letters written after the marriage fully establish that fact.   Concerning those letters it is objected that they were improperly admitted in evidence; but under the peculiar circumstances of this case we think they were properly allowed to come in, as showing that there was no change in the condition of mind of the testatrix; that she exhibited the same traits and characteristics in her peculiar forms of expression and references to persons after as before her marriage, and they bear internal evidence of being the spontaneous productions of her own pen, without any interference or coercion of a third party.   On the whole case the decree of the surrogate admitting the will to probate should be affirmed, with costs.   All concur.